IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SHELIA H.,

        **Plaintiff,**

v.                                       Civil Action 3:22-cv-340
                                          Judge Michael J. Newman
                                          Magistrate Judge Kimberly A. Jolson

**COMMISSIONER OF
SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Shelia H., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the following reasons, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

**I.    BACKGROUND**

In September 2018, Plaintiff protectively filed her applications for DIB and SSI, alleging that she was disabled beginning December 7, 2017, due to seizures, stress, COPD, emphysema, risk for falling, severe headaches, depression, anxiety, subarachnoid hemorrhage, cutaneous abscess of back excluding buttock, chronic bronchitis, tumors, back problems, insomnia, sexual assault, pelvic pain, right foot goes inward, hemisensory defect, abnormality of gait, gout abscess, and rheumatoid arthritis. (R. at 360–65, 366–70, 388). After her applications were denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing. (R. at 83–124). Ultimately, the ALJ denied Plaintiff's applications in a written decision on October 20, 2021. (R.

at 14–43). When the Appeals Council denied review, that denial became the final decision of the Commissioner. (R. at 1–8).

Next, Plaintiff brought this action. (Doc. 1). As required, the Commissioner filed the administrative record, and the matter has been fully briefed. (Docs. 10, 11, 12, 13).

### A. Relevant Hearing Testimony

The ALJ summarized Plaintiff's hearing testimony as follows:

> [Plaintiff] testified she is separated and lives in a house with her daughter. She is unable to work for both physical and mental reasons. Physically, [Plaintiff] has at least 4 seizures a month triggered by flashing lights and hot/humid weather resulting in daily headaches, balance issues, and tremors. She uses supplemental Oxygen for 3 hours when going outside and at night for COPD symptoms that are aggravated by chemicals. She smokes cigarettes. She also has hand pain from carpal tunnel syndrome and can lift no more than 5 pounds. [Plaintiff] uses a cane every day and a walker in her house due to back pain that radiates to the right leg and interferes with sleep. Right footwear is limited to flip flops so she can walk no longer than 20 yards and has a "handicap" placard. However, she has not sought further treatment beyond medication that causes sedation because of COVID.
>
> As for her mental health, [Plaintiff] stated she has a history of bipolar disorder and those symptoms consist of mood swings, anger outbursts, anxiety, social isolation, and depression.

(R. at 20–21).

### B. Relevant Medical History

The ALJ summarized Plaintiff's medical records as to her relevant physical impairments as follows:

> [Plaintiff]'s primary physical impairment is a history of COPD alternatively diagnosed throughout the record as asthma (Exhibits B4F / B5F / B6F / B22F / B33F / B39F). Her respiratory complaints, for which she uses a nebulizing machine (Exhibit B18E), are significant. Spirometric testing performed in September 2019 showed FVC and FEV readings which represented 65% and 50% of predicted values after administration of bronchodilation, respectively (Exhibits B14F / B18F) representing "severe" obstruction (Exhibit B14F at 6).
>
> Supplemental oxygen was prescribed by [Plaintiff]'s pulmonologist in September 2017, but only for nocturnal use (Exhibit B39F at 31). Dr. Yacoub then prescribed supplemental portable oxygen in November 2018 (Exhibit B39F at 44), but that

> was in response to an exacerbation of [Plaintiff]'s respiratory symptoms (Exhibit B39F at 57). Otherwise, flares of symptoms have been treated conservatively on an outpatient basis with treatment typically consisting of a course of antibiotics and a dose of steroids as well as medications (Exhibits B4F at 11, 21, 58/B22F/B23F/B33F/B39F at 57). Smoking cessation also has been advised on multiple treatment occasions (see, e.g. Exhibits B36F / B39F).
>
> Medical records indicate that there was an incident in the past in August 2016 when [Plaintiff] suffered head trauma secondary to a convulsive event when she struck her head on concrete (Exhibit B4F at 143). Since that time, she has been followed by neurology (Exhibit B4F at 226-227) and podiatry (Exhibit B1F) and alleges various residuals including right foot drop (Exhibit B26F), migraine headaches, neurocognitive deficits, some further seizure activity (Exhibit B4F at 143, 202, 211) and frequent falls requiring the use of a quad-based cane and four-wheeled walker for ambulation (Exhibits B1F at 9 / B4F at 52 / B31F at 16 / B18E). [Plaintiff] has had a series of ER visits for breakthrough seizures and associated headaches (Exhibits B4F at 39, 79, 225) and was admitted on one occasion in September 2018 for an acute exacerbation of chronic headaches and seizure disorder (Exhibit B4F at 47). There is some question about [Plaintiff]'s anticonvulsant medication compliance (Exhibit B4F at 79). Nevertheless, there has been no acute pathology to account for [Plaintiff]'s symptoms and lab work has been without significant abnormality (Exhibit B4F at 39, 47). CT scans and imaging of [Plaintiff]'s head and cervical spine have been nonacute (Exhibits B4F at 62, 238, 260, 266, 272). Beyond evidence of "mild" generalized encephalopathy, EEG testing also has been negative (Exhibit B4F at 62, 235). [Plaintiff] does have a "higher risk of seizures" due to her past subarachnoid hemorrhage (SAH)/subdural hematoma (SDH), and as such, continues anticonvulsant medication treatment (Exhibits B4F /B5F). But, her seizure episodes have been described from a neurological standpoint as "most consistent with non epileptic events" (Exhibit B4F at 196), and she has been referred by neurology for counseling and treatment of anxiety and depression and probable somatization or conversion (Exhibit B4F at 176).

(R. at 21–22).

### C. Medical Opinions

The ALJ summarized and evaluated the medical opinions pertaining to plaintiff's physical impairments as follows:

> [Plaintiff]'s neurologist, Barbara Phillips, M.D., submitted an assessment of her physical functioning capabilities in September 2017 (Exhibit B30F). But, beyond offering diagnoses of transient alteration of awareness, tremors, and headaches, Dr. Phillips' opinion evidence is incomplete even noting that functional limitations are not evaluated in the scope of her practice. As such, her opinion evidence is not persuasive.

3

Dr. Yacoub submitted an assessment of [Plaintiff]'s physical capabilities in May 2021 (Exhibits B34F / B38F). He indicated that [Plaintiff] can/lift carry just 5 pounds and that her ability to stand/walk and sit was limited but offered no indication as to what extent. In any event, the pulmonary function testing of record does not warrant this level of lifting limitation especially given that chest x-rays have shown no active cardiopulmonary disease (Exhibits B4F at 299, 300 / B22F at 17) and physical examination findings reveal normal breath sounds with no respiratory distress or wheezing (Exhibits B4F / B17F/ B21F / B23F / B25F).

Other opinion evidence in the record includes the findings of Dr. Oza who consultatively examined [Plaintiff] on February 26, 2019 *** (Exhibit B8F).

Dr. Oza diagnosed residual right-sided weakness, a speech impairment, and a seizure disorder stable on an anticonvulsant (Keppra). She noted that [Plaintiff] walked with a cane, and in her opinion, [Plaintiff]'s work-related activities are affected "even at rest." This conclusion seems to preclude [Plaintiff] from performing any and all work activity which is wholly disproportionate to the imaging evidence of record that indicates lumbar degenerative changes of no more than moderate severity and do not support finding [Plaintiff]'s use of an ambulatory aide as a medical necessity. Dr. Oza also concluded that [Plaintiff] had difficulty using her right hand due to carpal tunnel syndrome, but this was prior to [Plaintiff]'s subsequent surgical release in May 2019 (Exhibit B12F at 15) which resolved many of her symptoms so that [Plaintiff] has sufficient manipulative ability and grip strength to use both hands on a frequent basis. In short, Dr. Oza's conclusions regarding [Plaintiff]'s functional capabilities are not sufficiently specific to be useful in a function-by-function analysis of [Plaintiff]'s potential physical limitations. Accordingly, the undersigned finds this opinion evidence is not persuasive.

DDD reviewing physician, Bradley Lewis, M.D., assessed [Plaintiff]'s physical condition on May 2, 2019, based on the evidence of record without actually examining [Plaintiff] (Exhibits B3A / B5A). According to Dr. Lewis, [Plaintiff] has "severe" physical impairments of spine disorders, soft tissue injury, epilepsy, and visual impairment. Dr. Lewis concluded that [Plaintiff] retains the functional capacity to lift as much as 20 pounds occasionally and 10 pounds frequently. [Plaintiff] can sit and stand/walk as much as 6 hours each during any given 8-hour workday. She can use foot controls bilaterally on an occasional basis. Hand controls on the right can be operated frequently. [Plaintiff] can perform handling and fingering on the right on a frequent basis. [Plaintiff] can climb ramps and stairs, balance, stoop, kneel, crouch, and crawl occasionally. She can never climb ladders, ropes, or scaffolds. She should avoid concentrated exposure to temperature extremes, humidity, and pulmonary irritants. She should avoid all exposure to hazards such as machinery and unprotected heights (Exhibit B5A at 15-17).

The record was then reviewed by Elizabeth Das, M.D. on September 24, 2019 (Exhibits B7A/B9A). According to Dr. Das, [Plaintiff] has "severe" physical

4

impairments of spine disorders, soft tissue injury, epilepsy, and visual impairment. Dr. Das concluded that [Plaintiff] retains the functional capacity to lift as much as 20 pounds occasionally and 10 pounds frequently. [Plaintiff] can sit and stand/walk as much as 6 hours each during any given 8-hour workday. Hand controls on the right can be operated frequently. [Plaintiff] can perform handling and fingering on the right on a frequent basis. [Plaintiff] can climb ramps and stairs, balance, and stoop occasionally. She can never climb ladders, ropes, or scaffolds. She should avoid concentrated exposure to temperature extremes, humidity, and pulmonary irritants. She should avoid all exposure to hazards such as heavy machinery and unprotected heights (Exhibit B9A at 13-16).

Due to their conclusion that there is new and material evidence in the current record, both DDD reviewing physicians declined to adopt the prior final and binding decision of December 11, 2017 (Exhibits B5A at 17 / B9A at 16) that found [Plaintiff] had the residual functional capacity to perform light work with additional postural, respiratory, and safety limitations (Exhibit B1F at 15). *** However, there is new and material evidence documenting further change in [Plaintiff]'s physical condition, namely the pulmonary function testing results, suggesting more significant limitations of [Plaintiff]'s physical capacity, and for this reason, the residual functional capacity of the prior ALJ decision does not apply and the opinion evidence from Drs. Lewis and Das is only partially persuasive. Instead, the undersigned finds it is appropriate to reduce [Plaintiff]'s residual functional capacity to "sedentary" work. By definition, sedentary work is generally done in a seated position. It does not involve lifting more than 10 pounds.

*** No compelling evidence has been presented to show that [Plaintiff] lacks the capacity to perform the basic walking, standing, sitting, and lifting requirements of sedentary work as defined. Straight leg raise has not been uniformly positive (Exhibit B29F), and overall, [Plaintiff] remains neurologically intact without gross motor or sensory deficits (Exhibits B1F/B4F / B17F / B21F / B21F / B29F / B33F). Motor strength of the bilateral upper and lower extremities is 5/5, and muscle tone is normal (Exhibits B4F / B25F / B29F). Thus, even given the widespread nature of [Plaintiff]'s symptomatology, i.e., chronic pain in the back and "all [her] joints" (Exhibit B21F at 2), restricting her to sedentary work seems to be a more reasonable and accurate estimation of her physical capacity while also fully accommodating any reduced lung functioning and decreased lumbar range of motion (Exhibit B29F at 45).

Collectively, Drs. Lewis and Das imposed a mixture of limitations that have been incorporated into the residual functional capacity discussed herein with an additional limitation based upon the current record that they did not have the benefit of reviewing. Accordingly, it is found that [Plaintiff] can climb ramps and stairs, balance, kneel, stoop, crouch, crawl no more than occasionally. She cannot climb ladders, ropes, or scaffolds. On multiple treatment occasions, she has presented with normal breath sounds with no respiratory distress or wheezing (Exhibits B17F

5

> / B21F / B25F). But to avoid aggravating respiratory symptoms, [Plaintiff] should not have concentrated exposure to temperature extremes, high concentrations of humidity, or respiratory irritants. [Plaintiff] can use the bilateral hands for handling and fingering and operating hand controls on a frequent basis to accommodate complaints of bilateral hand numbness and weakness (Exhibit B33F) status post surgery. Muscle strength testing in her lower extremities has most often remained at 5/5, and gait has been described as normal as recently as August 2021 (Exhibit B39F at 38). Thus, restricting [Plaintiff] to operating foot controls with the lower extremities on an occasional basis allows for findings of gait abnormality and lower extremity muscle weakness (Exhibits B1F / B26F). For safety considerations, [Plaintiff] should not be expected to perform work at unprotected heights or around dangerous machinery. Job duties should not involve driving of automotive equipment. These limitations also take into account the ophthalmological/optometric consultative examination performed by Matthew Sprowl, M.D. in April 2019 (Exhibit B10F). Dr. Sprowl's report indicates that visual acuity with best correction tested at 20/25 in the left and right eyes. Visual fields were normal in both eyes. Muscle function also was normal in both eyes. Though no specific functional limitations are included, Dr. Sprowl's findings are entirely consistent with other visual testing records from [Plaintiff]'s optometrist, D. Douglas Friend, O.D. (Exhibits B9F / B13F) revealing no worse than minimal visual field loss, and as such, the examination reports of both Drs. Sprowl and Friend are persuasive.

(R. at 30–32).

The ALJ summarized and evaluated the medical opinions pertaining to plaintiff's mental impairments as follows:

> [Plaintiff]'s pulmonologist, Georges Yacoub, M.D., submitted a mental functional capacity assessment in May 2021 (Exhibit B34F at 3). Dr. Yacoub indicated [Plaintiff] has only moderate level limitations in each area of work-related functioning, yet then concluded she is unable to engage in any substantial gainful activity. Given this dichotomy in his assessment, the undersigned views Dr. Yacoub's conclusions with some skepticism and finds this opinion evidence is not persuasive.
>
> In order to clarify the nature and severity of any existing mental impairment, [Plaintiff] was referred for a psychological examination by the DDD. The examination was conducted by Alan Boerger, Ph.D. on February 19, 2019 (Exhibit B7F). [Plaintiff]'s chief complaints were physical health concerns and anxiety and depressive symptoms including low mood and crying spells, mood swings, anger outbursts/irritability, flashbacks, paranoia, visual and auditory hallucinations, poor memory, concentration problems, lack of judgment, and sleep disturbances.
>
> She no longer received outpatient counseling and had never been psychiatrically hospitalized. At the time of the examination, [Plaintiff] resided with her boyfriend

and 12-year old child. A typical day involved doing household chores and paperwork. She attempted to help with cooking and seldom went shopping due to anxiety. She regularly socialized with neighbors and her family.

[Plaintiff] presented as adequately dressed and groomed and walked slowly with a cane. She was talkative and appeared somewhat physically tense. Yet, she was cooperative. Thought processes were appropriate, relevant, and coherent. Speech was 100% understandable. There was no indication of any thought content abnormalities. [Plaintiff] was alert and fully-oriented.

She could not preform serial 7s but was able to recall 2 of 4 objects after 5 minutes, 4 digits forward and 3 digits backward, and could perform most single digit math tasks.

Based on his examination, Dr. Boerger diagnosed a panic disorder, depression, and BIF. He found some cognitive deficits in understanding and retaining instructions, concentration, and stress tolerance, and also noted that [Plaintiff] has had some difficulty relating to others in past work settings which suggests that some degree of social functioning limitation is appropriate as well. [Plaintiff] also alleged vague hallucinatory experiences, but she exhibited full contact with reality and clearly was not psychotic. Thus, while Dr. Boerger's findings reflect possibly "severe" mental impairments they are not ones that are indicative of a "disabling" level of mental illness, and his assessment of [Plaintiff]'s mental functioning is persuasive.

In light of [Plaintiff]'s allegations of cognitive impairment, she also underwent neuropsychological evaluation performed by Fadi Tayim, Ph.D. on November 2, 2017 (Exhibit B4F at 143-146). [Plaintiff] endorsed a longstanding history of anxiety and depression, a learning disability, balance and coordination difficulties, chronic back issues, tremor, and hypertension. She also alleged headaches and a litany of global neurocognitive deficits that included short- and long-term memory problems, inattention, executive dysfunction, receptive language, and some difficulty managing basic and instrumental daily living activities (bathing safely, managing medications, driving, and cooking) [Plaintiff] presented as casually dressed and smelled of cigarette smoke. She was alert and fully-oriented and showed no apparent signs of physical or emotional distress. Gait was normal with no observable difficulty with balance and coordination. Both upper- and lower-extremity functions appeared intact; no tremor or motor dysfunction was apparent. [Plaintiff] demonstrated intact comprehension of all questions and instruction. Expressive speech was slow in pace but otherwise normal. No word finding difficulties were observed and no paraphasic errors were noted during the interview or assessment. [Plaintiff] did not require corrective lenses and subsequently denied any difficulty reading or viewing stimuli. Thought processes were linear and goal-directed. Thought content was intact and specific to the evaluation's content. Affect was generally full and appropriate. Rapport was easily established and maintained. In fact, Dr. Tayim described [Plaintiff] as cooperative and a pleasure to assess.

> As part of his evaluation, Dr. Tayim conducted psychometric testing and found [Plaintiff]'s overall IQ was in the borderline range. However, he also indicated [Plaintiff]'s exam results were an underestimation of her true level of cognitive functioning including any retrieval deficits which somewhat undermines [Plaintiff]'s allegations of serious memory and cognitive problems. Dr. Tayim recommended [Plaintiff] engage in proper medication compliance and add a counseling component as well, but did not identify any specific functional limitations, and as such, his findings are only partially persuasive DDD psychologists, Aracelis Rivera, Psy.D. and Cynthia Waggoner, Ph.D., evaluated the claimant's mental condition based on the evidence of record without examining [Plaintiff] on February 27, 2019 and August 17, 2019, respectively (Exhibits B3A / B5A / B7A / B9A). In the opinion of Drs. Rivera and Waggoner, [Plaintiff] has "severe" mental impairments of anxiety and obsessive-compulsive disorders, depressive, bipolar and related disorder, and BIF. [Plaintiff] has a moderate limitation in her ability to understand, remember, or apply information.
>
> She has a moderate limitation in her ability to interact with others. [Plaintiff] also has a moderate limitation in her ability to concentrate, persist, or maintain pace, and adapt or manage oneself. In their assessments, both DDD reviewing psychologists adopted the findings in the prior ALJ decision, pursuant to AR 98-4(6), which limited [Plaintiff] to the performance of simple, repetitive tasks involving simple instructions and simple decision making with no strict production quotas or fast pace in a setting with routine work and few changes and occasional contact with the public, coworkers, and supervisors (Exhibits B1A at 15 / B5A at 18 / B9A at 16).
>
> The opinions of the DDD reviewing psychologists are persuasive. Based on the evidence of record, the undersigned agrees that no new and material evidence has been presented since the issuance of the prior decision to show significant change (i.e., deterioration) in [Plaintiff]'s mental status since 2017. [Plaintiff] receives sporadic (Exhibit B24F at 8) and routine mental health treatment, and their suggested restrictions seem to fully account for evidence of [Plaintiff]'s cognitive deficits and, as such, the findings made in the prior decision relative to the severity of [Plaintiff]'s alleged mental functioning capacity are adopted pursuant to the provisions of AR 98-4(6) with some refinement to particular limitations based upon the current record.

(R. at 24–26).

### D. The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirement through June 30, 2018. (R. at 21). She has not engaged in substantial gainful employment since December 7, 2017, the alleged onset date. (*Id.*). The ALJ also determined that Plaintiff has the following severe impairments:

residuals of a remote prior closed head injury, a history of pseudoseizures, asthma/chronic obstructive pulmonary disease (COPD), lumbar degenerative disc disease, a history of carpal tunnel syndrome, anxiety, depression, and borderline intellectual functioning (BIF). (*Id.*). Still, the ALJ found that none of Plaintiff's impairments, either singly or in combination, meets or medically equals a listed impairment. (R. at 28).

> The ALJ assessed Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, [the ALJ] finds that the [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) subject to the following limitations: (1) occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; (2) never climbing ladders, ropes, or scaffolds; (3) no work around hazards such as unprotected heights or dangerous machinery; (4) no driving of automotive equipment; (5) frequent use of the hands for handling, fingering, and operating hand controls; (6) no concentrated exposure to temperature extremes, respiratory irritants, or high concentrations of humidity; (7) occasional use of the lower extremities for foot controls; (8) performing simple, routine, and repetitive tasks; (9) occasional contact with coworkers and supervisors; (10) no public contact; (11) no fast-paced work or strict production quotas; and (11) very little, if any, change in the job duties or the work routine from one day to the next.

(R. at 29–30).

As for the allegations about the intensity, persistence, and limiting effects of Plaintiff's symptoms the ALJ found that Plaintiff's symptoms are "largely unsubstantiated by convincing objective medical evidence or clinical findings." (R. at 34).

The ALJ determined that Plaintiff is unable to perform her past relevant work as a production supervisor, cleaner, customer order clerk, packager, or auto motor detailer. (R. at 34–35). But, relying on testimony from a Vocational Expert ("VE"), the ALJ concluded that Plaintiff was able to perform work that existed in significant numbers in the national economy, such as a sorter, document preparer or inspector. (R. at 35–36). Consequently, the ALJ found that Plaintiff has not been under a disability, as defined in the Social Security Act, since December 7, 2017. (R.

at 36).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

In her Statement of Errors, Plaintiff contends that the ALJ's finding that she can engage in substantial gainful activity is not supported by substantial evidence given his failure to consider the impact of her seizures and use of supplemental oxygen on her ability to work. (Doc. 11 at 13–17). Plaintiff also challenges how the ALJ evaluated Dr. Yacoub's assessment. (*Id.* at 17–20). The Commissioner defends the ALJ's opinion. (*See generally* Doc. 12).

### A. Seizures

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009). *See also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security

regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining Plaintiff's residual functional capacity. *See, e.g.*, 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). Substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

When determining the RFC, the ALJ is charged with evaluating several factors, including the medical evidence (not limited to medical opinion testimony) and Plaintiff's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)). The RFC assessment must be based on all the relevant evidence in Plaintiff's case file. 20 C.F.R. § 416.945(a)(1). "Ultimately, 'the ALJ must build an accurate and logical bridge between the evidence and his conclusion.'" *Davis v. Comm'r of Soc. Sec.*, No. 2:19-CV-265, 2019 WL 5853389, at *5 (S.D. Ohio Nov. 8, 2019), *report and recommendation adopted*, No. 2:19-CV-265, 2020 WL 1482318 (S.D. Ohio Mar. 27, 2020) (quoting *Waye v. Comm'r of Soc. Sec.*, No. 1:18-CV-201, 2019 WL 364258, at *5 (S.D. Ohio Jan. 30, 2019), *report and recommendation adopted*, No. 1:18CV201, 2019 WL 718542 (S.D. Ohio Feb. 20, 2019)).

Here, the ALJ found that Plaintiff could perform a range of sedentary work with the following limitations:

> (1) occasionally climbing ramps and stairs, balancing, kneeling, stooping, crouching, and crawling; (2) never climbing ladders, ropes, and scaffolds; (3) no work around hazards such as unprotected heights or dangerous machinery; (4) no driving of automotive equipment; (5) frequent use of the hands for handling, fingering, and operating hand controls; (6) no concentrated exposure to temperature extremes, respiratory irritants, or high concentrations of humidity; (7) occasional

> use of the lower extremities for foot controls; (8) performing simple, routine, and repetitive tasks; (9) occasional contact with coworkers and supervisors; (10) no public contact; (11) no fast-paced work or strict production quotas; and (11) very little, if any, change in the job duties or the work routine from one day to the next.

(R. at 29–30).

Plaintiff argues that the ALJ did not properly evaluate how her seizures affect her ability to work when he crafted the RFC. The Undersigned agrees.

In his decision, the ALJ acknowledged that Plaintiff has experienced seizure activity since she suffered a traumatic brain injury in August 2016. (R. at 22 (citing R. at 796 (November 7, 2017 progress note from The Clinical Neuroscience Institute MVS); 856 (April 18, 2017 emergency department notes from Upper Valley Medical Center); 864 (March 22, 2017 progress note from Midwest Medical SVCS – Affiliated Internists))). Namely, the ALJ noted that Plaintiff was admitted to the emergency room on multiple occasions for "breakthrough seizures and associated headaches" and for "an acute exacerbation of chronic headaches and seizure disorder." (R. at 22 (citing R. at 692 (September 17, 2018 emergency department notes from Upper Valley Medical Center after Plaintiff presented with a recurrent headache); 731 (September 13, 2018 emergency department notes from Upper Valley Medical Center); 877 (February 19, 2017 emergency department notes from Upper Valley Medical Center after Plaintiff presented with a full body seizure); 699 (September 17, 2018 final impression of Plaintiff's symptoms from Upper Valley Medical Center))).

The ALJ also summarized certain parts of Plaintiff's medical records:

> CT scans and imaging of the claimant's head and cervical spine have been nonacute (Exhibits B4F at 62, 238, 260, 266, 272). Beyond evidence of "mild" generalized encephalopathy, EEG testing also has been negative (Exhibit B4F at 62, 235). The claimant does have a "higher risk of seizures" due to her past subarachnoid hemorrhage (SAH) / subdural hematoma (SDH), and as such, continues anticonvulsant medication treatment (Exhibits B4F / B5F). But, her seizure episodes have been described from a neurological standpoint as "most consistent with non epileptic events" (Exhibit B4F at 196), and she has been referred by

12

> neurology for counseling and treatment of anxiety and depression and probable somatization or conversion (Exhibit B4F at 176).

(R. at 22). The ALJ also appears to have relied upon a state agency physician report, dated February 26, 2019, noting that Plaintiff's "[s]eizures were controlled on medication." (R. at 23).

The ALJ noted that Plaintiff testified that she has at least four seizures a month. (R. at 20 (citing R. at 94)). But when fashioning the RFC, the ALJ did not grapple with this testimony. This matters because the vocational expert testified that more than one absence per month would be work preclusive. (R. at 116).

Still more, Plaintiff testified that she has been unable to drive for the last four years due to the frequency of her seizures. (*Id.* at 91–92). She said that she has a constant headache that progresses to a migraine, in addition to four seizures per month. (*Id.* at 93–94). And, when she has a seizure, she "drop[s] to the floor[,]" sometimes losing control of her bladder. (*Id.* at 94, 107–08). She needs to sleep for at least three hours after a seizure (*id.* at 107), and has headaches, body aches, tremors, and joint tightness. (*Id.* at 94). She represented that her seizures are ongoing, but she does not always go to the hospital when she has one. (R. at 108). In fact, she testified that she has avoided the hospital since the start of the COVID-19 pandemic. (*Id.*). The ALJ failed to discuss any of this testimony.

Though an ALJ need not cite every aspect of a claimant's testimony, her testimony must be considered. *See* 20 CFR 416.920. If true, Plaintiff's testimony leads to the conclusion that she will be absent more than one day per month. Accordingly, the ALJ failed to build a "logical bridge between the evidence and his conclusion." *Davis*, No. 2:19-CV-265, 2019 WL 5853389, at *5 (S.D. Ohio Nov. 8, 2019), *report and recommendation adopted*, No. 2:19-CV-265, 2020 WL 1482318 (S.D. Ohio Mar. 27, 2020) (citations omitted). It may well be that the ALJ found Plaintiff to be incredible, but he must say so. Remand is necessary to allow the ALJ to build a logical

13

bridge, supported by substantial evidence, between Plaintiff's seizure activity and her ability to work.

### B. The Remaining Assignments of Error

Plaintiff also argues that the ALJ's finding that she can engage in substantial gainful activity is not supported by substantial evidence given his failure to consider her use of supplemental oxygen on her ability to work (Doc. 11 at 15–17) and that the ALJ improperly evaluated Dr. Yacoub's medical assessment (*id.* at 17–20). But the Court's decision to recommend reversal and remand on the first assignment of error alleviates the needs for analysis on Plaintiff's remaining assignments of error. Nevertheless, if the recommendation is adopted, the ALJ may consider Plaintiff's remaining assignments of error on remand if appropriate.

### IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **GRANT** Plaintiff's Statement of Errors (Doc. 11), **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

### V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further

14

evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

      IT IS SO ORDERED.


Date: August 25, 2023                      /s/ Kimberly A. Jolson
                                                 KIMBERLY A. JOLSON
                                                 UNITED STATES MAGISTRATE JUDGE